UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Hussein S. M., | Case No. 21-cv-348 (JRT/TNL) |
| Petitioner, | |
| v. | REPORT & RECOMMENDATION |
| Monty Wilkinson, Acting Attorney General, Department of Justice; | |
| Alejandro Mayorkas, Secretary, Department of Homeland Security; | |
| Tae D. Johnson, Acting Director, Immigration and Customs Enforcement; | |
| Marcos Charles, Director, St. Paul Field Office, Immigration and Customs Enforcement; and | |
| Joel Brott, Sheriff, Sherburne County, | |
| Respondents. | |

Bruce H. Little, Barnes & Thornburg LLP, 225 South Sixth Street, Suite 2800, Minneapolis, MN 55402-4662; and John R. Bruning, The Advocates for Human Rights, Refugee & Immigrant Program, 330 Second Avenue South, Suite 800, Minneapolis, MN 55401 (for Petitioner);

Ana H. Voss, Ann M. Bildtsen, and Chad A. Blumenfield, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Respondents Monty Wilkinson, Alejandro Mayorkas, Tae D. Johnson, and Marcos Charles); and

Joel Brott[1].

---

[1] There has been no appearance by Respondent Joel Brott in this matter.

# I. INTRODUCTION

This matter comes before the Court on Petitioner Hussein S. M.'s Petition for Writ of Habeas Corpus ("Petition"), ECF No. 1, pursuant to 28 U.S.C. § 2241. The Petition has been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that the Petition be **DENIED** and this matter be **DISMISSED WITHOUT PREJUDICE**.

# II. BACKGROUND

Petitioner is a native and citizen of Ethiopia. Pet. ¶¶ 10, 22. Petitioner entered the United States in 2006 as a refugee and subsequently adjusted his status to lawful permanent resident. Pet. ¶¶ 10, 22; Decl. of Deportation Officer William J. Robinson ¶¶ 4-6, ECF No. 9.

**A. Removal Proceedings**

In approximately mid-November 2019, United States Immigration and Customs Enforcement ("ICE") detained Petitioner after he was booked on an assault charge. Robinson Decl. ¶¶ 9-10; *see* Pet. ¶¶ 11, 23. Petitioner was charged with removability under 8 U.S.C. § 1227(a)(2)(A)(ii), as an "alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." Robinson Decl. ¶ 11. Petitioner was ordered removed to Ethiopia on February 13, 2020. Pet. ¶¶ 11, 24; Robinson Decl. ¶ 12.

Petitioner appealed the removal order to the Board of Immigration Appeals ("BIA"). Pet. ¶¶ 11, 25; *see* Robinson Decl. ¶ 13. The BIA dismissed the appeal on August 6, 2020. Pet. ¶ 25; Robinson Decl. ¶ 13; *cf.* Pet. ¶ 12 (stating appeal was dismissed on August 4). Accordingly, Petitioner's removal order was administratively final as of August 6, 2020. 8 C.F.R. § 1241.1(a) (order of removal final "[u]pon dismissal of an appeal by the [BIA]"); *see also* 8 U.S.C. § 1231(a)(1)(B) (beginning of removal period).

### B. Post-Removal Events

In approximately mid-August 2020, ICE "submitted a travel document request packet to the Embassy of Ethiopia." Robinson Decl. ¶ 14. The Embassy conducted a telephone interview with Petitioner in early September. Robinson Decl. ¶ 15. At the end of September, "the Embassy of Ethiopia requested additional information on [Petitioner's] parents," and their "A-files were ordered from the National Records Center." Robinson Decl. ¶ 16.

At the end of February 2021, "the Embassy of Ethiopia requested to conduct an additional telephonic interview with [Petitioner]" and that interview took place two days later. Robinson Decl. ¶¶ 17-18. According to ICE, "[a] decision on the issuance of a travel document is forthcoming." Robinson Decl. ¶ 18.

Since he was ordered removed, Petitioner's detention has been reviewed by ICE twice—after 90 and 180 days. Pet. ¶¶ 27-28. "After his 90-day review, ICE continued detention based on the determination that there was a significant likelihood of removal in the reasonably foreseeable future." Pet. ¶ 27. Based on the record before the Court, Petitioner "has not yet received a decision from his 180-day review." Pet. ¶ 28.

There is no dispute that a charter removal flight to Ethiopia departed the United States in mid-January 2021. Pet. ¶ 29; Resp. at 1, ECF No. 8.

### III. HABEAS PETITION

#### A. Petitioner's Claims

Petitioner asserts that he has been detained beyond the presumptively reasonable six-month period for removal under *Zadvydas v. Davis*, 533 U.S. 678 (2001). Petitioner asserts that "his removal is factually impossible," Pet. ¶ 35; there is "no reasonable likelihood that he can be removed to Ethiopia in the foreseeable future," Pet. ¶ 1; and there is "no apparent end in sight to his detention," Pet. ¶ 3. In support of his assertion that there is not a significant likelihood of his removal in the reasonably foreseeable future, Petitioner notes that he was not on the January charter removal flight to Ethiopia and another charter removal flight to other African countries (including Cameroon, Angola, and the Democratic Republic of the Congo) scheduled for early February was cancelled. Pet. ¶¶ 29, 36.

Petitioner also relies on a January 20, 201 memorandum, entitled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities" (hereinafter "January 20 Memorandum"), from the then-Acting Secretary of the Department of Homeland Security. Memorandum from David Pekoske, Acting Secretary, Dep't of Homeland Sec., Review of & Interim Revision to Civil Immigration Enf't & Removal Polices & Priorities (Jan. 20, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf. *See* Pet. ¶¶ 31-35. This memorandum

4

> ordered a temporary pause on removals of noncitizens. Specifically, the January 20 Memorandum directed "an immediate pause on removals of any noncitizen with a final order of removal . . . for 100 days." The January 20 Memorandum justified this pause by pointing to DHS's "limited resources," which it claimed "must be prioritized to . . . provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently" and "comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom DHS personnel interact." Further, the January 20 Memorandum stated, the pause is necessary for DHS to "ensure that [its] removal resources are directed to [its] highest enforcement priorities."

*Texas v. United States*, No. 6:21-cv-00003, 2021 WL 723856, at *3 (S.D. Tex. Feb. 23, 2021) (footnote and citations omitted) (alterations in original) [hereinafter *Texas II*].

At the time this Petition was filed, a federal district court in Texas had issued a nationwide temporary restraining order regarding enforcement and implementation of this "pause" on removals.[2] *See generally Texas v. United States*, No. 6:21-cv-00003, ___ F. Supp. 3d ____, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021). While acknowledging that the temporary restraining order "apparently seeks to enjoin the Government from *not* removing noncitizens from the United States" and that "[i]t is unclear how, exactly, the [temporary restraining order] affects [him]," Petitioner argues that, "[u]nder the terms of the [January 20 Memorandum], ICE would be unable to remove [him] until at least May 1, 2021." Pet. ¶¶ 34-35.

---

[2] A preliminary injunction has since been entered. *See infra* Section IV.C.3.a.

Petitioner requests immediate release from custody on an order of supervision with any appropriate conditions pursuant to 8 C.F.R. § 241.5.

### B. Federal Respondents' Response

Respondents Monty Wilkinson, Alejandro Mayorkas, Tae D. Johnson, and Marcos Charles (collectively, "Federal Respondents") do not dispute that Petitioner has been in post-removal-order detention for more than six months. Resp. at 1. Rather, the Federal Respondents counter that Petitioner has not met his burden under *Zadvydas* to show good reason to believe there is no significant likelihood of his removal in the reasonably foreseeable future. Further, even if he had, any such showing is sufficiently rebutted because ICE "has made, and continues to make, significant progress towards [Petitioner's] removal," citing Petitioner's late February telephone interview with the Embassy of Ethiopia and the January charter removal flight. Resp. at 1, 8-9. The Federal Respondents additionally assert that "there is no reason to draw a logical inference about removal to Ethiopia from the cancellation of one flight to different countries," and the January 20 Memorandum's "pause" on removals continues to be enjoined. Resp. at 9.

The Federal Respondents contend that "ICE remains ready and able to remove Petitioner expeditiously," and there is a significant likelihood of Petitioner's removal in the reasonably foreseeable future. Resp. at 3; *see* Robinson Decl. ¶¶ 19-20.

### IV. ANALYSIS

"A writ of habeas corpus enables a person detained by the government to challenge the legality of his confinement and, if successful, obtain his release." *Abdulkadir A. v. Sessions*, No. 18-cv-2353 (NEB/HB), 2018 WL 7048363, at *2 (D. Minn. Nov. 13, 2018)

6

(citing *Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973)), *report and recommendation accepted*, 2019 WL 201761 (D. Minn. Jan. 15, 2019). Federal courts have jurisdiction to hear habeas challenges to the lawfulness of immigration-related detentions under 28 U.S.C. § 2241. *Denmore v. Kim*, 538 U.S. 510, 516-17 (2003); *Zadvydas*, 533 U.S. at 687.

### A. Fifth Amendment Due Process

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993); *accord Denmore*, 538 U.S. at 523.

### B. Post-Removal-Order Detention & *Zadvydas*

Petitioner has been ordered removed from the United States and there is no dispute that his removal order is administratively final. ICE is generally required to secure the removal of aliens like Petitioner within a 90-day "removal period." 8 U.S.C. § 1231(a)(1)(A); *Zadvydas*, 533 U.S. at 682. During this removal period, ICE is required to "detain the alien." 8 U.S.C. § 1231(a)(2).

An alien not removed during the removal period "shall be subject to supervision under [the prescribed] regulations." *Id.* § 1231(a)(3). Certain classes of aliens, however, "may be detained beyond the removal period" under 8 U.S.C. § 1231(a)(6), including those removable on the basis of certain criminal convictions. *Id.* § 1231(a)(6) (listing, among

others, those removeable under § 1227(a)(2)); *see Bah v. Cangemi*, 489 F. Supp. 2d 905, 915 (D. Minn. 2007) ("The language of § 1231(a)(6) is permissive, not restrictive."), *transferred and dismissed sub nom. Bah v. Mukasey*, 521 F.3d 857 (8th Cir. 2008).

On its face, § 1231(a)(6) can be read to authorize "indefinite and potentially permanent" detention. *Zadvydas*, 533 U.S. at 689-90, 696; *Chen v. Banieke*, No. 15-cv-2188 (DSD/BRT), 2015 WL 4919889, at *3 (D. Minn. Aug. 11, 2015); *see Bah*, 489 F. Supp. 2d at 916. In *Zadvydas*, the Supreme Court construed § 1231(a)(6) to "limit[] an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States" in order to comport with due process. 533 U.S. at 689-90; *accord Chen*, 2015 WL 4919889, at *3. The Supreme Court focused on "the statute's basic purpose"—"assuring the alien's presence at the moment of removal." *Zadvydas*, 533 U.S. at 699. The Supreme Court held that if the alien's removal was not reasonably foreseeable, his or her continued detention was unreasonable and no longer lawful. *Id.* at 699-700.

"The Supreme Court went on to hold that it is presumptively reasonable to keep an alien subject to a final removal order in custody for a total of six months." *Bah*, 489 F. Supp. 2d at 916 (citing *Zadvydas*, 533 U.S. at 701). The Supreme Court explicitly stated that this presumption "does not mean that every alien not removed must be released after six months." *Zadvydas*, 533 U.S. at 701; *accord Bah v. Cangemi*, 548 F.3d 680, 685 (8th Cir. 2008). Rather, "[a]fter this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."

*Zadvydas*, 533 U.S. at 701.  The Supreme Court additionally observed that "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink."  *Id.*  Ultimately, the Supreme Court held that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."  *Id.*

### C. *Zadvydas* as Applied to Petitioner

Petitioner has been in post-removal-order detention for approximately 8 months. Accounting for *Zadvydas*'s six-month presumption, Petitioner's detention has exceeded the period of presumptive reasonableness by 2 months.  But, *Zadvydas* is not a magical clock.  *See id.*  Under *Zadvydas*, ICE may continue to detain Petitioner "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."  *Id.*  Petitioner thus must "provide[] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."  *Id.*

Petitioner essentially raises three arguments in support of his assertion that there is no significant likelihood of his removal in the reasonably foreseeable future: (1) delay in obtaining travel documents; (2) not being placed on the January charter removal flight and the cancellation of the February flight to other African countries; and (3) certain agency memoranda.

#### 1. Travel Documents

Petitioner states that he "does not believe that ICE possesses a valid travel document for him," Pet. ¶ 27, and little progress has been made to obtain a travel document.

When a foreign country delays issuing travel documents "for an extraordinarily long

period" of time, it may be possible to infer "that documents will not issue at all, and thus that there is no significant likelihood of removal." *Jaiteh v. Gonzales*, No. 07-cv-1727 (PJS/JJG), 2008 WL 2097592, at *3 (D. Minn. Apr. 28, 2008), *report and recommendation adopted*, 2008 WL 2074163 (D. Minn. May 14, 2008); *accord Ahmed v. Brott*, No. 14-cv-5000 (DSD/BRT), 2015 WL 1542131, at *4 (D. Minn. Mar. 17, 2015), *report and recommendation adopted*, 2015 WL 1542155 (D. Minn. Apr. 7, 2015). Stated differently, "at some point in time the inability to procure travel documents may provide 'good reason' to believe that removal is unlikely to be carried out." *Joseph v. United States*, 127 F. App'x 79, 82 (3d Cir. 2005) (per curiam). But the mere passage of time is not sufficient to create such an inference. *Chen*, 2015 WL 4919889, at *4 (citing cases); *see, e.g.*, *Ahmed*, 2015 WL 1542131, at *4 ("The delays encountered thus far by the government are not alone sufficient to trigger an inference that there is no significant likelihood of removal . . . .").

The record reflects that, within approximately 30 days of Petitioner's removal order becoming administratively final, ICE submitted a travel document request packet to the Embassy of Ethiopia and the Embassy conducted a telephonic interview with Petitioner. Approximately, three weeks later, the Embassy requested additional information regarding Petitioner's parents, and their files were ordered.

There is nothing in the record to explain the approximately five-month delay between the Embassy of Ethiopia's request for additional information at the end of September 2020 and the second interview of Petitioner at the end of February 2021. Petitioner argues that this second interview was prompted by the filing of his habeas petition in early February 2021. While this is not an unreasonable inference to draw, it is

10

also not unreasonable to infer that this second interview followed the Embassy's receipt and review of the files on Petitioners' parents that had been ordered.

In any event, since his removal order became administratively final, ICE has arranged for interviews of Petitioner with the Embassy of Ethiopia and been in communication with the Embassy regarding the additional information requested. At this juncture and based on the evidence in the record, Petitioner's post-removal-order detention has not been so "extraordinarily long" as to create an inference that travel documents will not issue. *See Jaiteh*, 2008 WL 2097592, at *2 (over 14 months in post-removal detention); *see also, e.g.*, *Joseph*, 127 F. App'x at 80 (more than 11 months post-removal detention); *Chen*, 2015 WL 4919889, at *5 (over 9 months post-removal detention); *Ahmed*, 2015 WL 1542131, at *3 (9 months post-removal detention). Nor is there anything in the record indicating that the Embassy of Ethiopia has refused to issue a travel document to Petitioner.

### 2. Implications of COVID-19

Next, Petitioner maintains that the Federal Respondents "currently have no plan or ability to execute [his] removal . . . to Ethiopia, and even if they did, his removal is even less likely to occur in the foreseeable future given the continued dangers of the COVID-19 pandemic." Pet. ¶ 4.

Petitioner relies on the fact that he was not on the January charter removal flight, which he asserts was the first removal flight to Ethiopia since the COVID-19 pandemic began. But, as just discussed, ICE is still in the process of obtaining a valid travel document for Petitioner. Thus, the fact that Petitioner was not scheduled to be removed on that flight is of little persuasive value in the context of this case.

11

Moreover, as Petitioner himself points out, "Ethiopia has been open to international flights for several months." Reply at 3, ECF No. 10; *see, e.g.*, *COVID-19 Information*, U.S. Embassy in Ethiopia, *available at* https://et.usembassy.gov/covid-19-information/ (commercial flights operating) (last updated Feb. 23, 2021). A charter removal flight to Ethiopia departed in January. ICE states that it "remains ready and able to remove [to] Ethiopia expeditiously," and that it "fully expects to execute [Petitioner's] removal order upon receipt of his travel document." Robinson Decl. ¶ 19. Without more, Petitioner's assertion that the cancellation of a removal flight to African countries *other than* Ethiopia somehow "signal[s] the unlikelihood of additional removal flights to Africa in the near future," *including* Ethiopia, amounts to speculation and conjecture. Pet. ¶ 36.

### 3. Agency Memoranda

Petitioner also points to two agency memoranda to show there is no significant likelihood of removal in the reasonably foreseeable future: the January 20 Memorandum and a February 18, 2021 memorandum, entitled "Interim Guidance: Civil Immigration Enforcement and Removal Priorities," issued by ICE's acting director, Memorandum from Tae D. Johnson, Acting Director, U.S. Immigration & Customs Enf't, Interim Guidance: Civil Immigration Enf't & Removal Priorities (Feb. 18, 2021) [hereinafter February 18 Memorandum], *available at* https://www.ice.gov/doclib/news/releases/2021/021821_civil-immigration-enforcement_interim-guidance.pdf. The Court discusses each in turn.

#### a. January 20 Memorandum

In the Petition, Petitioner expressed concern over the 100-day pause on removals set forth in the January 20 Memorandum because, "[u]nder the terms of the

12

[Memorandum], ICE would be unable to remove [him] until at least May 1, 2021." Pet. ¶ 35. But, on February 23, 2021, enforcement and implementation of January 20 Memorandum's 100-day pause was enjoined by a federal district court in the Southern District of Texas. *See generally Texas II*, 2021 WL 723856. That preliminary injunction is nationwide in scope and to "remain in effect pending a final resolution of the merits" of the Texas litigation absent further order from the issuing court or a higher federal court. *Id.* at *53.

Given that the 100-day pause has since been enjoined, it is not apparent to this Court what bearing, if any, the January 20 Memorandum has on the likelihood of Petitioner's removal in the reasonably foreseeable future.

### b.  February 18 Memorandum

In his reply, Petitioner references another agency memorandum, the February 18 Memorandum, which was issued after the Petition was filed. The February 18 Memorandum "covers enforcement actions, custody decisions, the execution of final orders of removal, financial expenditures, and strategic planning." Feb. 18 Mem. at 1. The Memorandum is "in effect until [the Secretary of the Department of Homeland Security] issues new enforcement guidelines," which are anticipated to be issued "in less than 90 days." *Id.*

Among other things, the February 18 Memorandum sets forth "[c]ivil [i]mmigration [e]nforcement and [r]emoval [p]riorities." *Id.* at 3  The Memorandum prioritizes three

categories of cases: (1) national security[3], (2) border security[4], and (3) public safety[5]. *Id.* at 4-5. "A civil enforcement or removal action that does not meet . . . [this] criteria for presumed priority cases will require preapproval . . . ." *Id.* at 5. In discussing the approval process for other cases that do not meet the "criteria for presumed priority cases," the February 18 Memorandum states:

> As always, it is important that ICE endeavor to remove noncitizens with final removal orders who have remained in post-order detention for more than 90 days. ICE will continue to review such noncitizens' cases on a regular basis, consistent with existing law and policy. ICE will endeavor to remove such noncitizens consistent with legal requirements and national, [sic] border security, and public safety priorities.

*Id.* at 6.

Petitioner asserts that he does not fall into any of the three high-priority categories and, because "[h]e is not a priority for immediate removal, . . . there is no basis in the record of his detention to expect any urgency on [ICE's] behalf." Reply at 5-6. Emphasizing that portion of the February 18 Memorandum regarding removal of aliens "with final removal orders who have remained in post-order detention for more than 90 days," Feb. 18 Memo. at 6, Petitioner asserts that his removal order has been administratively final for more than 200 days and "[n]o action was taken to initiate the process to remove [him] after September

---

[3] Aliens who have engaged in or are suspected of engaging in terrorism, terrorism-related activities, espionage, or espionage-related activities or whose "apprehension, arrest, or custody is otherwise necessary to protect the national security of the United States." Feb. 18 Memo. at 4.
[4] Aliens who were "apprehended at the border or a port of entry while attempting to unlawfully enter the United States on or after November 1, 2020," or were "not physically present in the United States before November 1, 2020." *Id.* (footnote omitted).
[5] Aliens who (a) "pose[] a threat to public safety," and (b) have been convicted of a qualifying aggravated felony or were involved in certain activities related to criminal street gangs, organized criminal gangs, and transnational criminal organizations. *Id.* at 4-5.

14

until the habeas petition was filed in February," Reply at 6.

As stated above, *see supra* Section IV.C.1, there is more than one reasonable inference that can be drawn from the timing of Petitioner's second interview with the Embassy of Ethiopia. Moreover, while Petitioner contends the February 18 Memorandum demonstrates that there is no significant likelihood of his removal in the reasonably foreseeable future, the second interview with the Embassy of Ethiopia was arranged a week *after* the issuance of the February 18 Memorandum, undercutting Petitioner's argument concerning the Memorandum's purported effect on his case. Accordingly, in light of the record before the Court, what impact, if any, the February 18 Memorandum will have on the likelihood of Petitioner's removal in the reasonably foreseeable future is largely, if not entirely, speculative at this juncture.

### 4. Conclusion

Generally speaking,

> [c]ourts have found no significant likelihood of removal in five types of cases: (1) where the detainee is stateless and no country will accept him; (2) where the detainee's country of origin refuses to issue a travel document; (3) where there is no repatriation agreement between the detainee's native country and the United States; (4) where political conditions in the country of origin render removal virtually impossible; and (5) where a foreign country's delay in issuing travel documents is so extraordinarily long that the delay itself warrants an inference that the documents will likely never issue.

*Ahmed*, 2015 WL 1542131, at *4 (citing cases); *see also, e.g.*, *Deqa M. Y. v. Barr*, No. 20-cv-1901 (ECT/DTS), 2020 WL 4926618, at *2 (D. Minn. Aug. 21, 2020). "In other words, for there to be *no* significant likelihood of removal in the foreseeable future, there must be

15

some indication that the government is either unwilling, or due to seemingly insurmountable barriers, incapable of executing an alien's removal." *Ahmed*, 2015 WL 1542131, at *4. Petitioner does not contend that he falls within any of these categories.

As stated above, cases in which aliens have challenged their continued detention under § 1231 while travel documents are pending acknowledge "that 'at some point in time the inability to procure travel documents may provide good reason to believe that removal is unlikely to be carried out.'" *Macow v. Sessions* No. 16-cv-3408 (JRT/TNL), 2017 WL 1753293, at *4 (D. Minn. Apr. 4, 2017) (quoting *Joseph*, 127 F. App'x at 82) (internal quotation marks omitted), *report and recommendation adopted*, 2017 WL 1855858 (D. Minn. May 5, 2017). In such circumstances, "it may be possible to infer 'that documents will not issue at all . . . .'" *Id.* (quoting *Jaiteh*, 2008 WL 2097592, at *3) (alteration in original).

But, "[d]elays in securing an alien's removal do not alone indicate that removal is a 'remote possibility at best' and 'no longer practically attainable' unless they are so lengthy as to raise the specter that the government is simply 'unable to remove' the alien because travel documents will likely never issue." *Chen*, 2015 WL 4919889, at *4. In doing so, these cases recognize "the practical fact," but no less frustrating truth, "that the 'reasonableness of detentions pending deportations cannot be divorced from the reality of the bureaucratic delays that almost always attend such removals.'" *Id.* (quoting *Fahim v. Ashcroft*, 227 F. Supp. 2d 1359, 1367 (N.D. Ga. 2002)); *accord Gathiru v. Banieke*, No. 15-cv-4247 (DSD/TNL), 2016 WL 8671833, at *6 (D. Minn. Sept. 9, 2016), *report and recommendation adopted*, 2016 WL 6436621 (D. Minn. Oct. 28, 2016); *see also Kahn v.*

*Fasano*, 194 F. Supp. 2d 1134, 1137 (S.D. Cal. 2001).

*Zadvydas* does not speak of finite schedules or concrete timeframes. *See Chen*, 2015 WL 4919889, at *5. The fundamental inquiry under *Zadvydas* is "[w]hether a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal . . . ." 533 U.S. at 699; *see id.* at 701 ("[A]n alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."); *see also Chen*, 2015 WL 4919889, at *5. *Zadvydas* was concerned with circumstances approaching indefinite detention "where removal seems a remote possibility at best" and detention "has no obvious termination point." 533 U.S. at 690, 697; *accord id.* at 695 ("[T]he issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States."); *Chen*, 2015 WL 4919889, at *4.

The Court concludes that Petitioner has not met his burden and therefore is not entitled to relief under *Zadvydas*. That being said, "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Zadvydas*, 533 U.S. at 701. It would certainly behoove ICE to increase efforts to effectuate Petitioner's removal "before time and circumstance suggest that removal is no longer reasonably foreseeable." *Chen*, 2015 WL 4919889, at *6 n.8. If ICE continues to detain Petitioner without making further progress toward his removal or if circumstances—whether related to the COVID-19 pandemic or not—otherwise begin to suggest that his removal is no longer practically attainable in the foreseeable future, Petitioner may renew his *Zadvydas* claims at that time by filing a new petition for a writ of

habeas corpus. Accordingly, the Court recommends that the Petition be dismissed without prejudice.

## V. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus, ECF No. 1, be **DENIED** and this matter be **DISMISSED WITHOUT PREJUDICE**.

Dated: April   9   , 2021

                  *s/ Tony N. Leung*
                  Tony N. Leung
                  United States Magistrate Judge
                  District of Minnesota

                  *Hussein S. M. v. Wilkinson et al.*
                  Case No. 21-cv-348 (JRT/TNL)

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).